Filed 8/30/13  In re C.P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re C.P., a Person Coming Under the Juvenile Court Law. | D063665 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J515555C) |
| v. | |
| CHARLES P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

Charles P. appeals following the dispositional hearing in the juvenile dependency case of his nine-and-one-half-year-old daughter, C.P. Charles contends the court erred by denying his request for presumed father status (Fam. Code, § 7611, subd. (d)).[1] We affirm.

BACKGROUND

This is C.P.'s third dependency case. The first case spanned more than two and one-half years when she was one to three and one-half years old. The second case lasted for two months when she was six and one-half years old. When the instant case began, C.P. was nine years old. She told a social worker, "I've been through enough. I want this to stop."

All three cases were based on domestic violence between C.P.'s mother, Sabrina B., and Sabrina's two successive male partners, her husband and a boyfriend.[2] During the three cases, C.P. was in seven placements, in addition to Sabrina's home, for a total of approximately three years. Charles was incarcerated when C.P. was born and has been in custody for a total of six years since then. Between the second and third cases, Charles was involved in domestic violence; he threw his girlfriend to the floor and threatened to beat her with a baseball bat. Charles denied the violence and minimized his criminal record.

---

[1]   All further statutory references are to the Family Code.

[2]   The first case also involved an unsanitary and unsafe home and neglect by Sabrina.

Charles was represented by counsel throughout the first dependency case and was incarcerated for most of the time. The juvenile court found that he was C.P.'s biological father and entered a paternity judgment. Charles never requested presumed father status, and the court found that Sabrina's husband was C.P.'s presumed father. The case ended with an order granting Sabrina sole custody of C.P. The court clerk mailed a copy of the order to Charles, who was still incarcerated.

Charles's whereabouts were unknown during the second case. The case was dismissed when Sabrina agreed to voluntary services.

When the San Diego County Health and Human Services Agency (the Agency) filed the third dependency case in December 2012, Charles's whereabouts were unknown. In January 2013, the Agency found him in San Diego. In February, the court made a true finding on the petition and Charles requested presumed father status. In March, the court denied the request and ordered C.P. removed from Sabrina's custody and placed in foster care.

## DISCUSSION

"California law provides that a man is presumed to be the father of a child if he 'receives the child into his home and openly holds out the child as his natural child.' " (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652, quoting § 7611, subd. (d).) Charles had the burden of establishing presumed father status by a preponderance of the evidence. (*In re Spencer W.,* at pp. 1652-1653.) On appeal we apply the substantial evidence test. "[W]e review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. [Citation.] We do not reweigh the

3

evidence but instead examine the whole record to determine whether a reasonable trier of fact could have found for the respondent." (*Id.* at p. 1650.)

" 'Presumed fatherhood, for purposes of dependency proceedings, denotes one who "promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise[.]" ' [Citation.] A presumed 'father's rights flow from his relationship (or attempted relationship) to the mother and/or child and not merely from his status as the biological father.' [Citation.] The presumed father's commitment to the child is a key consideration." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209-1210.) "In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own (§ 7611, subd. (d)), courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*Id.* at p. 1211.)

The court here characterized some of Charles's testimony "evasive" and not "credible" and questioned his veracity. The court found Sabrina's stipulated testimony

4

more specific and therefore more credible. We accept these credibility evaluations. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

In his paternity questionnaire in the first dependency, Charles declared that he had stated to "mother, family" that he was C.P.'s father. In the third dependency, he expanded the list to include "friends and family and members of the community." Charles never sought to place his name on C.P.'s birth certificate, never offered to sign a declaration of paternity and never requested public assistance for C.P., despite Sabrina's suggestion. Until the advent of this case, Charles took no legal action to obtain custody of C.P.

According to Sabrina, Charles lived with her and C.P. for about one week during the year C.P. was born.[3] Charles visited C.P. once just before her third birthday, then did not see her again until after she turned six. From the time C.P. was six years old until just before she turned seven, Charles saw her about one to two times a week, during the day, and around that time they had an undisclosed number of overnight visits in Sabrina's home, with Sabrina present. Charles participated in C.P.'s seventh, eighth and ninth birthday parties and planned the latter party. In the months before the filing of the third dependency petition, shortly before C.P.'s ninth birthday, there were approximately eight

---

[3] Charles testified he lived with C.P. and Sabrina for about five months, and, during that time, Sabrina paid the rent and he paid other bills. He further testified that while Sabrina was pregnant and he was out of custody, he obtained an apartment for her, but he was taken into custody before he could move in. He also testified, however, that he was already in custody when he learned Sabrina was pregnant.

nonconsecutive overnight visits, at Sabrina's request, because she was between homes.[4] Charles had no further contact with C.P. until nearly two months after the petition was filed.

According to Sabrina, Charles was never involved in C.P.'s life and never provided any support.[5] Charles claimed he helped support C.P. by furnishing disposable diapers, milk and school supplies and, when he lived with her, by "taking care of her, watching her." Even were we to credit this claim and Charles's other testimony, substantial evidence supports the conclusion he cared for C.P. only incidentally. For most of her life, he was incarcerated; at other times, his whereabouts were unknown.

Events shortly before the dispositional hearing in the instant case further demonstrated Charles's lack of "an abiding commitment to [C.P.] and [her] well-being . . . ." (*E.C. v. J.V.* (2012) 202 Cal.App.4th 1076, 1085.) At a supervised visit, he asked her if she would like to move to Arizona with him and told her the foster parents were the only reason she was doing well in school. When C.P. cried and explained her disinclination to leave San Diego, Charles accused her of stealing, lying and cheating. When C.P. refused to attend a subsequent visit, Charles told the social worker he would give C.P. another "whoopin" if she continued to play games. He admitted that on two

---

[4]     The plan was for C.P. to stay with Charles longer, but she was very unhappy with him and, at her request, Sabrina picked her up early. According to Charles, C.P. lived with him for a month.

[5]     Sabrina acknowledged that on one occasion in 2012, Charles's girlfriend gave C.P. some clothes. By the time this case began, Charles had a part-time job and a two-year degree from a technical college. Before that time, he was unemployed.

previous occasions, he had given her "a whoopin," which he defined as "[five] swats with a belt."

Substantial evidence supports the finding Charles was not a presumed father.

DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McINTYRE, J.